## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID HUTCHINSON, derivatively on behalf of LUMINAR TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> AUSTIN RUSSELL, MIKE MCAULIFFE, ALEC E. GORES, MARY LOU JEPSEN, SHAUN MAGUIRE, KATHARINE A. MARTIN, JUN HONG HENG, MATTHEW J. SIMONCINI, and DANIEL D. TEMPESTA, <br><br> Defendants, <br><br> and <br><br> LUMINAR TECHNOLOGIES, INC., <br><br> Nominal Defendant. | Civil Action No.: <br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff David Hutchinson ("Plaintiff"), by and through his undersigned attorneys, derivatively and on behalf of Nominal Defendant Luminar Technologies, Inc. ("Luminar" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Austin Russell ("Russell"), Mike McAuliffe ("McAuliffe"), Alec E. Gores ("Gores"), Mary Lou Jepsen ("Jepsen"), Shaun Maguire ("Maguire"), Katharine A. Martin ("Martin"), Jun Hong Heng ("Heng"), Matthew J. Simoncini ("Simoncini"), and Daniel D. Tempesta ("Tempesta") (collectively, the "Individual Defendants," and with Luminar, "Defendants"), for and among other

things, breaches of their fiduciary duties to Luminar stockholders by intentionally and recklessly making or permitting the dissemination of materially false and misleading statements and violating the federal securities laws and breaching their fiduciary duties.

As for Plaintiff's complaint against Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases issued by and about Luminar, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of Luminar against certain officers and members of its Board of Directors (the "Board") for their breaches of fiduciary duties, violations of the federal securities laws, and other misconduct, which occurred between February 28, 2023 and March 17, 2023, both dates inclusive (the "Relevant Period"), and which resulted in substantial damage to Luminar and its stockholders.

2.     Luminar purports to be "revolutionizing transportation through our lidar autonomous driving technology." In the Company's quarterly report filed on Form 10-Q with the SEC on August 8, 2023, it represented that its light detection and ranging sensor ("lidar") "is expected to meet the demanding performance, safety, reliability and cost requirements to enable

next generation safety and autonomous capabilities for passenger and commercial vehicles as well as other adjacent markets."

3.    Lidar is a sensor technology that works by actively scanning its environment with a laser and detecting the return signal to measure distance and speed.[1] Photonic Integrated Circuits ("PIC") are an integral component of lidar technologies. NASA describes PIC as "a revolutionary technology that enable[s] complex optical functionality in a simple, robust, reliable, chip-sized package with very low, size, weight, and power, extremely high performance, and low cost." In the autonomous driving context, PIC can help to provide a more accurate data map of a vehicle's surroundings to enhance safety.[2] As lidar technologies continue to develop, an emphasis on smaller, more compact components has emerged. As a result, companies like Luminar are incentivized to bring smaller versions of products, such as PIC, to market.

4.    In February 2023, the Company hosted a "Luminar Day" investor conference at its headquarters. Defendant McAuliffe, the Chief Executive Officer ("CEO") of Luminar's semiconductor subsidiary, discussed the Company's chip strategy at a presentation. Behind Defendant McAuliffe during his presentation was a screen with an image of Luminar's purported PIC technology.

5.    *Forbes* published an article on March 17, 2023, entitled "Lidar Maker Luminar Accused of Using Image of Rival's Chip in Investor Conference." This article discussed that Lidwave, a semiconductor developer and a major competitor of Luminar, accused Luminar of repeatedly misappropriating an image of Lidwave's PIC technology (the "Image"). The *Forbes*

---

[1] https://brainporteindhoven.com/en/business-and-innovation/cases/the-road-ahead-for-integrated-photonics-in-automotive
[2] https://smartphotonics.nl/blog/how-lidar-works-in-autonomous-driving-vehicles-using-photonic-integrated-circuits

article revealed that the Image was used during the Company's presentation given on Luminar Day, was used in materials on Luminar's website, and the Individual Defendants displayed the Image representing it was Luminar's PIC technology, not as Lidwave's PIC technology. Moreover, the *Forbes* article discussed that Lidwave also threatened Luminar with legal action if the wrongful use of the Image was not rectified.

6. On this news, Luminar's stock price fell $0.78 per share, or 9.09% over two consecutive trading days, from closing at a price of $8.58 per share on March 16, 2023 to close at $7.80 per share on March 20, 2023.

7. After Lidwave threatened Luminar with legal action, Luminar removed the Image from its investor presentation and website materials as well as took down a YouTube video that displayed the Image.

8. Luminar then updated its presentation materials, substituting the image of Lidwave's appealing PIC, which was colorful, sleek, small, and simple, with an image of Luminar's purported PIC technology. The updated image of Luminar's PIC technology was not as appealing as it was tiny and black-and-white. It was unclear to investors whether this image was of Luminar's entire PIC or just an individual part of it. The new image was far less attractive than Lidwave's PIC in the Image as the new image appeared bulkier.

9. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing Luminar to make materially false and misleading statements regarding Luminar's business, operations, and prospects to investors including that: (1) in order to promote its products, Luminar tried to use an image of a competitor's PIC as its own; (2) such conduct subjected Luminar to a significant risk of litigation and/or regulatory enforcement actions; (3) once disclosed, the foregoing would adversely impact Luminar's business, reputation,

and stock price; and (4) Luminar failed to maintain internal controls. As a result of the foregoing, the Individual Defendants' statements about Luminar's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10. Furthermore, during the Relevant Period, in breach of their fiduciary duties, the Individual Defendants caused Luminar to fail to maintain adequate internal controls.

11. The Individual Defendants' misconduct has caused Luminar and Defendants McAuliffe and Russell to be named as defendants in a federal securities class action lawsuit pending in the United States District Court for the Middle District of Florida (the "Securities Class Action"). Given the misconduct and the Securities Class Action, Luminar was required to commence internal investigations as well as implement adequate internal controls, incurred losses from the waste of corporate assets due to the Individual Defendants' unjust enrichment. The Individual Defendants received were wrongly overcompensated by Luminar and benefitted from the wrongdoing alleged herein. As such, Luminar will have to expend significant sums of money.

12. Luminar has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13. Plaintiff did not make a demand prior to bringing this action because it would be futile. Considering the Individual Defendants' breaches of fiduciary duties and their collective engagement in fraud and misconduct, the substantial likelihood of the directors' liability in this derivative action, Defendants McAuliffe's and Russell's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of Luminar with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 21D of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. § § 78j(b), 78u-4(f))).

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this District 28 U.S.C. §§ 1391 and 1401 because the alleged misstatements and wrongs complained of herein entered this District, Luminar is incorporated in this District, and the Individual Defendants are officers and/or directors of Luminar during the Relevant Period.

## PARTIES

18.     Plaintiff is a current Luminar stockholder and has continuously held Luminar stock at all relevant times.

19.     Nominal Defendant Luminar is incorporated in Delaware and has principal executive offices in Orlando, Florida. Luminar's common stock trades on the Nasdaq Stock Market ("NASDAQ") under ticker symbol "LAZR."

20.     Defendant Russell is the founder of Luminar. Russell has been Luminar's President, CEO, and Chairman of the Board since December 2020. Defendant Russell previously was the President and CEO of Luminar Technologies, Inc. prior to the business combination with Gores Metropoulos, Inc., a special purpose acquisition company ("SPAC") that closed on December 2, 2020 (the "Business Combination"). Russell also served as a member of the board of directors of

the pre-Business Combination Luminar since 2012. In 2022, Russell received $93,915,469 in total compensation from the Company. As of February 28, 2023, Russell beneficially owned 1,030,000 shares of the Company's Class A stock and 97,088,670 shares of the Company's Class B stock. His ownership gave him 78.2% of the total voting power with respect to all shares of Class A common stock and Class B common stock, as a single class. As the price per share of the Company's common stock at close of trading on February 28, 2023 was $8.95, Defendant Russell owned approximately $9.2 million worth of Luminar stock.

21.    Defendant McAuliffe has served as the CEO of the Company's semiconductor subsidiary, Luminar Semiconductors, since October 2022, and as the subsidiary's President since February 2023.

22.    Defendant Gores has been a director of Luminar since December 2020. In 2022, Defendant Gores received $235,427 in total compensation from the Company. As of February 28, 2023, Defendant Gores beneficially owned 5,155,719 shares of the Company's common stock, which amounts to approximately $46 million worth of Luminar stock given that the price per share of the Company's common stock on February 28, 2023 was $8.95.

23.    Defendant Jepsen has been a director of Luminar since February 2021. She also serves as Chair of the Nominating & ESG Committee and as a member of the Compensation & Human Capital Management Committee. In 2022, Defendant Jepsen received $249,788 in total compensation from the Company. As of February 28, 2023, Defendant Jepsen beneficially owned 31,784 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2023 was $8.95, Defendant Jepsen owned approximately $284,467 worth of Luminar stock.

24.     Defendant Maguire has been a director of Luminar since June 2021. He also serves as a member of the Nominating & ESG Committee. In 2022, Defendant Maguire received $243,990 in total compensation from the Company. As of February 28, 2023, Defendant Maguire beneficially owned 16,560 of the Company's common stock. Given that the price per share of the Company's commons stock at the close of trading on February 28, 2023 was $8.95, Defendant Maguire owned approximately $148,212 worth of Luminar stock.

25.     Defendant Martin has been a director of Luminar since February 2021. She also serves as Chair of the Compensation & Human Capital Management Committee and as a member of the Nominating & ESG Committee. In 2022, Defendant Martin received $257,427 in total compensation from the Company. As of February 28, 2023, Defendant Martin beneficially owned 32,675 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2023 was $8.95, Defendant Martin owned approximately $292,441 worth of Luminar stock.

26.     Defendant Heng has been a director of Luminar since June 2021. He also serves as a member of the Audit Committee and the Compensation & Human Capital Management Committee. In 2022, Defendant Heng received $249,594 in total compensation from the Company. As of February 28, 2023, Defendant Heng beneficially owned 2,434,188 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2023 was $8.95, Defendant Heng owned approximately $22 million worth of Luminar stock.

27.     Defendant Simoncini has been a director of Luminar since December 2020. He also serves as Chair of the Audit Committee and as a member of the Compensation & Human Capital Management Committee. In 2022, Defendant Simoncini received $267,427 in total compensation

from the Company. As of February 28, 2023, Defendant Simoncini beneficially owned 306,126 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2023 was $8.95, Defendant Simoncini owned approximately $2.7 million worth of Luminar stock.

28.    Defendant Tempesta has been a director of Luminar since August 2022. He also serves as a member of the Audit Committee. In 2022, Defendant Tempesta received $522,638 in total compensation from the Company. as of February 28, 2023, Defendant Tempesta beneficially owned 63,320 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2023 was $8.95, Defendant Tempesta owned approximately $566,714 worth of Luminar stock.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.    By reason of their positions as officers, directors, and/or fiduciaries of Luminar, and because of their ability to control the business and corporate affairs of Luminar, the Individual Defendants owed Luminar and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Luminar in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Luminar and its shareholders.

30.    Each director and officer of the Company owes to Luminar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31.    The Individual Defendants, due to their positions of control and authority as directors and/or officers of Luminar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

33.    The Individual Defendants' conduct complained of herein involves issuance of false and misleading statements, a knowing and culpable violation of their obligations as directors and/or officers of Luminar, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.    The Individual Defendants were officers and directors of the Company and their conduct has been ratified by the remaining Individual Defendants who collectively comprised Luminar's Board at relevant times. Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Luminar to issue false and misleading statements of material fact in the Company's statements relating to the Company's prospects and failed to protect corporate assets.

35.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts

described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

36.    To discharge their duties, the officers and directors of Luminar were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Luminar were required to, among other things:

a.    Ensure that Luminar was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Luminar's Code of Business Conduct and Ethics (the "Code of Conduct");

b.    Conduct Luminar's affairs in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.    Remain informed as to how Luminar conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

d.    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Luminar and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e.    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Luminar's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

f.      Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

g.      Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

37.     The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Luminar.

38.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Luminar and were at all times acting within the course and scope of such agency.

39.     In addition, the Individual Defendants' actions and conduct has subjected the Company to at least the Securities Class Action. The Individual Defendants' actions also exposed the Company to potential actions or proceedings by regulators and Lidwave for the wrongdoing asserted herein. Further, the Individual Defendants' actions caused Luminar to suffer severe reputational harm. As a result, Luminar has expended, and will continue to expend, substantial sums of money to rectify the Individual Defendants' wrongdoing as well as the potential lost business and impaired goodwill.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

41.     During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct that caused the Company to issue false and misleading statements of material fact that failed to disclose and misrepresented adverse facts that were known to the Individual Defendants or were recklessly disregarded by them at the time they were made, including that: (1) in order to promote its products, Luminar tried to use an image of a competitor's PIC as its own; (2) such conduct subjected Luminar to a significant risk of litigation and/or regulatory enforcement actions; (3) once disclosed, the foregoing would adversely impact Luminar's business, reputation, and stock price; and (4) Luminar failed to maintain internal controls.

42.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) disguise and misrepresent the valuation of the Company; and (2) artificially inflate the Company stock price.

43.     Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

44.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially

assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

45.     During the times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Luminar and was acting within the course and scope of such agency.

## THE COMPANY'S CODE OF BUSINESS CONDUCT AND ETHICS

46.     The conduct of all Luminar officers, directors, and employees is governed by its Code Conduct.

47.     As part of its introduction, the Code of Conduct states that it is intended to:

- promote honest and ethical conduct, including the ethical handling of conflicts of interest;
- promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the U.S. Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;
- promote compliance with applicable governmental laws, rules and regulations;
- promote the protection of Company assets, including corporate opportunities and confidential information;
- promote fair dealing practices;
- deter wrongdoing; and
- ensure accountability for adherence to the Code.

48.     The next section of the Code of Conduct is titled "Core Values" which states in pertinent part:

Luminar is committed to serving its customers and employing individuals with personal standards consistent with that of the Company's standards of integrity, professionalism, and commitment to superior results. These standards create a foundation of trust and success that is reflected in the Company's relationships with customers, suppliers, stockholders, and one another.

49.     The Code of Conduct has a section titled, "Honest and Accurate Disclosures,"

which states in pertinent part:

> The Company strives to maintain integrity of the Company's records and public disclosures. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees and others with whom the Company does business. The Company depends on the books, records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

> To help ensure the integrity of the Company's records and public disclosure, the Company requires that:

> - no entry be made in the Company's books and records that is intentionally false or misleading;
> - transactions be supported by appropriate documentation;
> - the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records;
> - employees comply with the Company's system of internal controls and be held accountable for their entries;
> - any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;
> - employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents;
> - no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and
> - records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

50.    The Code of Conduct has a section titled, "Protection and Proper Use of Company Assets," which states in pertinent part:

> All directors, officers and employees should protect the Company's assets and ensure their reasonable and efficient use. Theft, carelessness, and waste have a direct impact on the Company's profitability and are prohibited.

> All Company assets should be used only for legitimate business purposes, though incidental personal use is permitted. Employees should have no reasonable expectation of privacy when using Company assets; the Company has the right to

inspect the assets at its sole discretion, for any reason. Any suspected incident of fraud or theft should be reported for investigation immediately.

The obligation to protect Company assets includes the Company's proprietary information. Proprietary information includes intellectual property such as trade secrets, patents, trademarks, and copyrights, as well as business and marketing plans, engineering and manufacturing ideas, designs, databases, records and any nonpublic financial data or reports. Unauthorized use or distribution of this information is prohibited and could also be illegal and result in civil or criminal penalties. Refer to the Luminar's Confidential Information and Invention Assignment Agreement that you signed for additional information.

51.    The Code of Conduct has a section titled, "Media Contacts and Public Communications," which states in pertinent part:

It is the Company's policy to disclose material information concerning the Company to the public only in accordance with the Company's Third Party Communications, Media, and Social Media policies in order to avoid inappropriate publicity and to ensure that all such information is communicated in a way that is reasonably designed to provide broad, non-exclusionary distribution of information to the public. Only those individuals designated as official spokespersons in the Company's Third Party Communications, Media, and Social Media policies may address questions regarding financial matters. Please see these policies for additional information.

52.    In violation of the Code of Conduct, the Individual Defendants disregarded their duties to stop the Company from making false and misleading statements, to maintain adequate internal controls, to protect corporate assets, and to comply with laws and regulations. The Individual Defendants' failure to perform their duties in good faith resulted in misrepresentations to the investing public and the Company's shareholders, and in engagement in conduct that was not in the best interest of the Company.

## **AUDIT COMMITTEE CHARTER**

53.    For members of the Audit committee, Defendants Simoncini, Heng, and Tempesta (collectively the "Audit Committee Defendants"), Luminar's Audit Committee Charter (the "Charter"), imposes additional responsibilities and tasks.

54.     According to the Charter, the Audit Committee's purpose is to:

[A]ssist the Board of Directors (the "Board") of Luminar Technologies, Inc. (the "Company") in fulfilling its oversight responsibilities with respect to: (i) the integrity of the financial reports and other financial information provided by the Company to its stockholders and others; (ii) the Company's financial policies and procedures and disclosure controls and procedures; (iii) the Company's system of internal control over financial reporting; (iv) the Company's auditing, accounting and financial reporting processes; (v) the qualifications and independence of the Company's independent registered public accounting firm ("independent accountants"); (vi) the performance of the Company's internal audit function (the "Internal Auditor"); and (vii) the Company's financial and operational risk management (unless delegated to a separate committee of the Board). The Committee shall also review and approve related-party transactions (as defined and if required by applicable law, including rules of the Securities and Exchange Commission ("SEC") and the listing standards of The Nasdaq Stock Market LLC ("Nasdaq")). The Committee further aids the Board in its oversight of the Company's tax, legal, regulatory, information security and ethical compliance and the Company's processes and assessments with respect to the Company's management of risk. Moreover, the Committee prepares the report of the Audit Committee that SEC rules require to be included in the Company's annual proxy statement.

In carrying out this function, the Committee shall: (i) serve as an independent and objective party to oversee the Company's financial reporting process and internal control system; (ii) review and evaluate the qualifications and independence of the Company's independent accountants; (iii) approve all audit and permissible non-audit services provided by the Company's independent accountants; (iv) review and evaluate the performance of the Company's independent accountants and the Internal Auditor; and (v) facilitate open communication among the independent accountants, financial and senior management, legal counsel, the Internal Auditor, head of ethics and compliance and the Board.

The Committee will fulfill its oversight role primarily by carrying out the activities enumerated in the "Responsibilities and Duties" section of this Charter.

55.     The Charter includes a section titled "Documents/Reports Review," stating that the

Audit Committee's responsibilities include the following:

1. Review with senior financial management and the independent accountants prior to filing the Company's interim financial information, earnings press release and the financial information contained in the Company's quarterly reports on Form 10-Q, including: (i) the selection, application and disclosure of the critical accounting policies and practices

used; and (ii) any management certifications related thereto. The Committee Chair may represent the Committee for purposes of this review.

2.  Review the Company's annual financial statements and any other reports or financial information contained in the Company's Annual Reports on Form 10-K, including: (i) the selection, application and disclosure of the critical accounting policies and practices used; (ii) any management certifications related thereto; and (iii) any certification, report, opinion or review rendered by the independent accountants.

3.  Prepare the report of the Committee required by SEC rules to be included in the Company's proxy statement for each annual meeting.

4.  Review any reports submitted by the independent accountants, including a report, if prepared, relating to: (i) all critical accounting policies and practices used; (ii) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent accountants; and (iii) other material written communications between the independent accountants and management, such as any management letter or schedule of unadjusted differences, and discuss with the independent accountants any critical audit matters arising from the current period audit.

5.  At least annually, obtain and review a report by the independent accountants describing: (i) the independent accountants' internal quality control procedures; (ii) any material issues raised by the most recent internal quality control review, or peer review, of the independent accountants, or by any inquiry or investigation by governmental or professional authorities, within the preceding five (5) years, with respect to one or more independent audits carried out by the independent accountants, and any steps taken to address any such issues; and (iii) all relationships between the independent accountants and the Company (to assess the independent accountants' independence).

6.  Review and reassess the adequacy of this Charter at least annually, recommend to the Board appropriate changes to the Charter, and assure that the Charter as may be amended is either (i) posted on the Company's website or (ii) included as an appendix to the annual stockholders' meeting proxy statement at least once every three (3) years.

56.    In another section titled "Other Responsibilities" the Charter states that the Audit Committee has the following additional responsibilities:

1.  Oversee and review periodically with management the Company's policies relating to finance, capital expenditures, investment, asset management, information management, and the security of its intellectual and physical assets.

2.  Oversee financial-related risks, including risk assessment, major risk exposures and the steps management has taken to monitor and mitigate those exposures, but excluding the enterprise risks over which other Board committees have oversight responsibility.

3.  On behalf of the Board and unless delegated to a separate committee of the Board: (i) periodically receive reports from management to help fulfill the Committee's duties to oversee the principal risk exposures facing the Company and the Company's mitigation efforts in respect of such risks, including the Company's procedures and any related policies concerning risk assessment and risk management; and (ii) review the Company's risk management framework and programs, the Company's adherence to risk limits and its established risk appetite, and the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees, and on an annual basis recommend to the Board the articulation and establishment of the Company's risk appetite.

4.  Oversee the Company's business continuity and disaster preparedness planning.

5.  Review with management other finance, tax, legal and/or administrative issues that the Committee or the Board deems necessary or appropriate.

6.  Make reports and recommendations to the Board on matters within the scope of its functions.

7.  Review and approve all related-party transactions for which audit committee approval is required by applicable law (including SEC and Nasdaq rules).

8.  Retain and consult with independent counsel and other advisors, as it deems necessary or appropriate to carry out its duties, with funding provided by the Company.

9.  Assess the effectiveness of the Audit Committee. In addition to the activities described above, the Committee may perform such other functions as are consistent with its purpose and necessary or appropriate under applicable law, the Company's charter and/or Bylaws, and the resolutions and other directives of the Board.

57.    The Charter's section titled "Legal and Ethical Compliance" states that the Audit Committee has the following additional responsibilities:

1.  Oversee and review periodically with management, legal counsel, the head of Ethics and Compliance, and other experts, as appropriate, the programs and policies of the Company designed to ensure compliance with applicable laws and regulations, including compliance with financial crimes laws and regulations, the Foreign Corrupt Practices Act, foreign anti-corruption laws, and export control regulations, and with the Company's ethical standards, and the results of these compliance efforts. Review, investigate and recommend to the Board actions the Committee deems appropriate to be taken in connection with any matters pertaining to the integrity of the Company's executive officers (as determined under Rule 16a-1(f) of the Exchange Act), including conflicts of interest and adherence to standards of business conduct, as required by the policies of the Company.

2.  Oversee the ethics and compliance process as a procedure for receiving, retaining and treating complaints or concerns, including confidential and anonymous submissions received 6 by the Company regarding accounting, internal accounting controls, auditing or other matters in compliance with applicable law (including SEC rules).

3.  Review periodically with management, legal counsel and other experts, as appropriate, any legal and regulatory matters that may have a material impact on the financial statements.

4.  Coordinate with the Nominating & ESG Committee and the Compensation & Human Capital Management Committee to oversee the Company's ESG reporting requirements and help set up processes to ensure that ESG disclosures comply with applicable laws, regulations and internal control practices.

58.    In violation of the Charter, the Audit Committee Defendants failed to exercise their risk management and risk assessment functions adequately and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Materially False and Misleading Statement Issued During the Relevant Period

59.    The Relevant Period begins on February 28, 2023 when Luminar hosted the

Luminar Day investor conference. During this conference, the Company gave presentations discussing Luminar's chip strategy for development of its Lidar technologies. During the presentation, Luminar displayed an image of a PIC that appeared elegant, sleek, small, simple in design, and capable of driving down economies of scale and reducing costs associated with the mass production of Lidar technologies. During the Luminar Day investor conference, the Individual Defendants caused Luminar to represent falsely to investors that the image of the PIC used in the Company's presentation was Luminar's own technology and design. The truth, however, was the PIC image Luminar displayed depicted Lidwave's PIC technology, Luminar's competitor:[3]



60.     Further, Luminar showed the Image in the Company's investor presentation materials on the Company's website and on live and recorded webcasts of the Luminar Day conference posted on YouTube. Despite using the Image in several contexts presenting it as its own product, Luminar did not attribute it to Lidwave.

---

[3] The Image of the PIC is the picture at the bottom right of the presentation slide.

61.    During the Luminar Day presentations, Defendant McAuliffe relied upon the presentation slides and boasted about the Company's progress of its Lidar and Lidar-enabling technologies, including its PIC. Defendant McAuliffe noted that the technology could effectively address many of the major economic and complexity issues associated with the mass production of Lidar and Lidar-enabling technologies. In particular, when referencing the slide containing the Image and not acknowledging Lidwave, Defendant McAuliffe stated, in pertinent part:

> We only focus on the hardest photon processing problems-generation, detection, and processing. This is what LIDAR is. It's one of the biggest, most difficult physics problems today, with other customers solving similar, very difficult photonic problems. So, we can now take the same platforms, the same products, closely aligned, and leverage that across multiple markets. We solve 1550. There is a general perception that 1550 is an expensive, traditionally an expensive process and it's maybe a drawback. That is not the case. We have solved that problem through, number one, architecture, as Jason described, number two, advanced packaging, and number three, we can drive the economies of scale and the economics associated with that by leveraging both Luminar volume and volume to the wider market. So, we're shifting gears, we're shifting gears to take what has been a sub-scale industry, sub-scale ecosystem, and industrializing that at scale. And we need to do that. We need to do that both for the economics and for the size, weight, and cost in order to deliver LIDAR at millions of units. And as an example, the other key advantage of siliconization is this: people think that maybe the biggest advantage is you control your own supply chain, that's true, you can control the quality, that's true, you can control the performance, that's true. But the biggest advantage of siliconization, in general, is you can take a lot of complexity and cost out of the product—complexity in cabling, complexity in optics, complexity in electromechanical. So, anything you can put in silicon, you can put in silicon. And I think we can see from other industry leaders, like big fruit companies, that owning that stack and internalizing and siliconizing anything you can delivers elegant architectures, breakthrough performance, and breakthrough economics.

62.    The above statements identified in ¶¶ 59-61 were materially false and misleading because Defendants failed to disclose material adverse facts about the Company's business, operations, and prospects including that: (1) in order to promote its products, Luminar tried to use an image of a competitor's PIC as its own; (2) such conduct subjected Luminar to a significant risk of litigation and/or regulatory enforcement actions; (3) once disclosed, the foregoing would

adversely impact Luminar's business, reputation, and stock price; and (4) Luminar failed to maintain internal controls. As a result of the foregoing, the Individual Defendants' statements about Luminar's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH EMERGES**

63.      On March 17, 2023,  *Forbes* published an article entitled "Lidar Maker Luminar Accused of Using Image of Rival's Chip In Investor Conference" revealing  that Lidwave accused Luminar  of  misappropriating  the  Image  with  Lidwave's  PIC  technology  as  Luminar's  own technology  during  Luminar  Day  investor  conference  and  in  other  materials  posted  on  the Company's website and online. The *Forbes* article also exposed that given on this misconduct, Lidwave threatened Luminar with legal action. The *Forbes* article stated in pertinent part:

> ***Luminar… is accused of passing off a next-generation chip design created by a rival as its own technology after showing an image of the processor at a recent investor conference and in materials on its website.*** Lidwave, the Israeli startup making the claim, says it plans to take legal action over the matter.

> ***The image, identified as a [PIC] by Luminar in its February 28 conference and webcast with no reference to Lidwave, looks identical to a chip on Lidwave's website that is its core technology.*** The Jerusalem-based company sent a cease-and-desist letter to Luminar on March 14 asking it to remove the image. It also notified the [SEC] of Luminar's "misuse of its product image to falsely promote its abilities and securities to investors."

> Lidwave said it hadn't received a response from the company as of 3 p.m. New York time on Friday.

> *      *      *

> ***"Integrated photonics allows lidar to become as scalable and profitable as anybody has imagined. . . . But surprisingly, the picture Luminar presented of a [PIC] as their solution is not their solution, but basically the exact image of our lidar,"*** Lidwave CEO Yehuda Vidal told Forbes. "***We will continue with a lawsuit if needed because it's a very huge problem for us. Some of our customers are very confused about what we do versus what they do."***

> *      *      *

23

The image appeared during a presentation by Mike McCauliffe, head of Luminar's semiconductor team. The full Luminar Day webcast on YouTube, which had nearly 750,000 views, was taken down and removed from the company's website.

"We have removed and replaced that image with an image of a new Luminar Semiconductor [PIC]," company spokesman Milin Mehta told Forbes. "It was inconsequential to the presentation."

(Emphasis added).

64.    Included in the *Forbes* article was a picture of Defendant McAuliffe during his Luminar Day presentation. This picture included the Image behind McAuliffe on a screen behind him:



Mike McCauliffe, head of Luminar's semiconductor team, discusses the company's chip strategy during its February 28 investor conference. LUMINAR VIA YOUTUBE

65.    The *Forbes* article also compared the presentation to a picture of Lidwave's PIC on its website which was the same as what appeared in the Company's Luminar Day presentation materials:



Lidwave's integrated photonics chip.  LIDWAVE

66.     The *Forbes* article further discussed how development of sleeker, smaller, and simpler Lidar components, like Lidwave's PIC, was crucial for companies developing Lidar and Lidar-enabling technologies as a way to manage costs and facilitate economies of scale associated with their production. The *Forbes* article continued to emphasize that this was particularly true for Luminar's business because it "is poised to be the biggest supplier of the technology by driving down the cost dramatically in the years to come" and continuing ted in pertinent part:

> Lidar's ability to create detailed, 3-D maps of a vehicle's surroundings using lasers has made it a core technology in the race to perfect self- driving cars and trucks. But it's also relatively expensive, with individual units costing thousands of dollars each. Luminar, which has high-volume supply agreements with automakers including Mercedes-Benz, Volvo, Nissan, Polestar, China's SAIC and truck maker Daimler, is poised to be the biggest supplier of the technology by driving down the cost dramatically in the years to come.

> Over the past five years, Orlando-based Luminar, created by optics prodigy (and Forbes 30 Under 30) alum Austin Russell moved from being one of dozens of lidar startups vying to challenge Velodyne, the first company to commercialize the technology for autonomous vehicles, to the de facto industry leader, in terms of the number of vehicles that will be using its sensors. Russell told *Forbes* last month that he intends to have Luminar lidar in "millions of vehicles on the road within a few years."

\*        \*        \*

Processing vast amounts of data collected by laser sensors requires ever more powerful chips that must also be cheaper and easier to produce. Lidwave's Vidal said that is exactly what his company, formed in 2019 and hoping to begin commercial deliveries in 2024, is working to perfect.

"The main problem holding back wide-scale adoption of lidar is its cost resulting from extremely complex microprecision assembly. Today there is no lidar producer that's conclusively solved the economy-of-scale (production) challenge," he said. "A photonic integrated chip platform is basically the Holy Grail for lidar."

67.    As such, Luminar was incentivized to represent that its PIC technology was the sleeker, smaller, simpler, and more cost-efficient design compared to its competitors' technology.

68.    When the *Forbes* article was published, Luminar's stock price fell $0.78 per share, or 9.09%, over two consecutive trading days, from closing at a price of $8.58 per share on March 16, 2023 to close at $7.80 per share on March 20, 2023.

69.    Luminar removed the Image from its website and presentation materials and removed the YouTube video of the Luminar Day presentation which showed the Image once Lidwave threatened the Company with legal action.

70.    Luminar then updated its Luminar Day presentation materials, replacing the Image with a smaller black-and-white image of Luminar's own PIC technology. The new image was unclear, thereby leaving investors confused as to whether the replacement was an image of Luminar's entire PIC or just an individual section of the chip. Importantly, the replaced image depicted a far bulkier PIC design that was less appealing to Luminar investors than the Image:[4]

---

[4] The updated image of Luminar's PIC is the picture at the bottom right of the amended presentation slide.



## DAMAGES TO LUMINAR

71.    As a direct and proximate result of the Individual Defendants' conduct, Luminar will lose and expend many millions of dollars.

72.    Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action filed against Luminar and Defendants McAuliffe and Russell for violations of the federal securities laws. Luminar will incur additional expenditures and economic harm due to, among other things, amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

73.    As a direct and proximate result of the Individual Defendants' conduct, Luminar has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

74.     Plaintiff brings this action derivatively and for the benefit of Luminar to redress injuries the Company suffered and will suffer as a direct result of the Individual Defendants' breaches of their fiduciary duties and other misconduct as directors and/or officers of Luminar. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

75.     Plaintiff has continuously been a stockholder of Luminar at all relevant times. Plaintiff will adequately and fairly represent the interests of Luminar in enforcing and prosecuting its rights.

76.     A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing this action, Luminar's Board consisted of the following eight individuals: Russell; Gores; Jepsen; Maguire; Martin; Heng; Simoncini; and Tempesta (the "Director Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Director Defendants.

77.     Demand is excused as to all of the Director Defendants as each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their misconduct by knowingly or recklessly making and/or causing the Company to make false and misleading statements and omissions of material facts about Luminar's business and operations. Thus, the Director Defendants are unable to impartially investigate their wrongdoing and are incapable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.

78.     The members of the Board either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

79.     The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly

approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs.

80.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

81.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and full prosecute such a suit even if they instituted it.

82.    The Director Defendants, as members of the Board, were and are subject to Luminar's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

83.    In violation of the Code of Conduct, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law,

including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

84.    Defendant Russell has served as Executive Chairman of the Board and as a Company director since December 2020. As such, Defendant Russell has been a director since before the Relevant Period. Moreover, the Company provides Defendant Russell with his principal occupation for which he receives significant compensation as detailed above. Russell cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company because that would expose him to liability and threaten his livelihood. Additionally, Defendant Russell is a defendant in the Securities Class Action and faces liability in that action.

85.    Further, Defendant Russell is a controlling shareholder of the Company, possessing 78.2% of its total voting power. The Company's most recent Proxy Statement, filed on Form DEF 14A on April 28, 2023 with the SEC, admits that Defendant Russell is a non-independent director. Given his status as a non-independent director, the lack of independence and the financial benefits received by Defendant Russell renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

86.    As Luminar's CEO Defendant Russell was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including any and all which involved Luminar's use of the Image. Defendant Russell conducted little, if any, oversight of the misconduct to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls consciously disregarded his duties to protect corporate assets. As a result, Defendant Russell breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Russell is futile and excused.

87. Defendant Gores has served as a Company director since December 2020. The Company provides Defendant Gores with significant compensation for his role as a director as detailed above. As such, Defendant Gores cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Gores renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a Company director, he conducted little, if any, oversight of the misconduct that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Gores breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Gores is futile and excused.

88. Defendant Heng has served as a Company director since June 2021. The Company provides Defendant Heng with significant compensation for his role as a director as detailed above. As such, Defendant Heng cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Heng renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a Company director, he conducted little, if any, oversight of the misconduct that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Heng breached his fiduciary duties, faces a substantial likelihood of

liability, and is neither independent nor disinterested. Thus, demand upon Defendant Heng is futile and excused.

89.    Defendant Jepsen has served as a Company director since February 2021. The Company provides Defendant Jepsen with significant compensation for her role as a director as detailed above. As such, Defendant Jepsen cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood. This lack of independence and the financial benefits received by Defendant Jepsen renders her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she conducted little, if any, oversight of the misconduct that caused the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Jepsen breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Jepsen is futile and excused.

90.    Defendant Maguire has served as a Company director since June 2021. The Company provides Defendant Maguire with significant compensation for his role as a director as detailed above. As such, Defendant Maguire cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Maguire renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a Company director, he conducted little, if any, oversight of the misconduct that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls, and consciously disregarded his

duties to protect corporate assets. As a result, Defendant Maguire breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Maguire is futile and excused.

91.     Defendant Martin has served as a Company director since February 2021. The Company provides Defendant Martin with significant compensation for her role as a director as detailed above. As such, Defendant Martin cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood. This lack of independence and the financial benefits received by Defendant Martin renders her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she conducted little, if any, oversight of the misconduct that caused the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Martin breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Martin is futile and excused.

92.     Defendant Simoncini has served as a Company director since December 2020. The Company provides Defendant Simoncini with significant compensation for his role as a director as detailed above. As such, Defendant Simoncini cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Simoncini renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a Company director, he conducted little, if any, oversight of the misconduct that caused the Company to make false and misleading statements,

consciously disregarded his duties to monitor internal controls, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Simoncini breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Simoncini is futile and excused.

93. Defendant Tempesta has served as a Company director since August 2022. The Company provides Defendant Tempesta with significant compensation for his role as a director as detailed above. As such, Defendant Tempesta cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Tempesta renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a Company director, he conducted little, if any, oversight of the misconduct that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Tempesta breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Tempesta is futile and excused.

94. The Audit Committee Defendants, Simoncini, Heng, and Tempesta, served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Charter by: engaging in or permitting Luminar to disseminate materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed

to exercise their risk management and risk assessment functions adequately; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

95.     Luminar has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Luminar any part of the damages Luminar suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

96.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

97.     The acts complained of herein constitute violations of fiduciary duties owed by Luminar's officers and directors, and these acts are incapable of ratification.

98.     Thus, for all the reasons set forth above, each, if not all, of the Director Defendants, or at least four of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

**Against Defendants McAuliffe and Russell for Contribution Under §10(b) and 21D of the Exchange Act**

99.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

100.    The conduct of McAuliffe and Russell, as described herein, has exposed the Company to significant liability under various federal securities laws by their misconduct.

101.    Luminar, McAuliffe, and Russell are named as defendants in the related Securities Class Action that alleges and asserts claims arising under the federal securities laws. Luminar is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

102.    If Luminar is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of McAuliffe and Russell as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

103.    As officers and directors, McAuliffe and Russell had the power or ability to, and did, control or influence, either directly or indirectly, Luminar's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

104.    The Individual Defendants are liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

105. McAuliffe and Russell have damaged the Company and are liable to the Company for contribution.

106. As such, Luminar is entitled to receive all appropriate contribution or indemnification from McAuliffe and Russell.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duties

107. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

108. The Individual Defendants owed Luminar fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

109. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

110. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of news about Luminar to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated and otherwise failing to ensure that adequate internal controls were in place regarding the serious business issues and deficiencies described above including: (1) the Company promoting its products by trying to use an image of a competitor's PIC as its own; (2) as such, creating a significant risk of litigation and/or regulatory enforcement actions would be commenced against Luminar; (3) adversely impacting Luminar's business, reputation, and stock price; and (4)

failing to maintain internal controls. As a result of the foregoing, the Individual Defendants' statements about Luminar's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

111.    These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

112.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

113.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

114.    Plaintiff, on behalf of Luminar, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Abuse of Control

115.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

116.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Luminar, for which they are legally responsible.

117.    As a direct and proximate result of the Individual Defendants' abuse of control, Luminar has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Luminar has

sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

118.    Plaintiff, on behalf of Luminar, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

119.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

120.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Luminar.

121.    The Individual Defendants were unjustly enriched because of the compensation they received while breaching their fiduciary duties owed to Luminar. In addition, The Individual Defendants received bonuses, stock options, or similar compensation from Luminar that was tied to the performance or artificially inflated valuation of Luminar. These payments were unjust in light of the Individual Defendants' misconduct.

122.    Plaintiff, as a stockholder and representative of Luminar, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

123.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

124.    Plaintiff, on behalf of Luminar, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Waste of Corporate Assets

125.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

126.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

127.    The Individual Defendants wasted corporate assets by, among other things, incurring and paying legal costs to defend the Company and its officers against the Securities Class Action as well as any action or proceeding brought by Lidwave.

128.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

129.    Plaintiff, on behalf of Luminar, has no adequate remedy at law.

## COUNT VI

### Against Individual Defendants for Gross Mismanagement

130.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

131.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Luminar in a manner consistent with the operations of a publicly-held corporation.

132.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Luminar has sustained and will continue to sustain significant damages.

133.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

134.    Plaintiff on behalf of Luminar has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Luminar, and that Plaintiff is an adequate representative of the Company;

B.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

C.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

D.    Awarding punitive damages;

E.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 22, 2023                                  Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Fax: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Erica L. Stone
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (213) 202-3807
Email: pkim@rosenlegal.com
Email: estone@rosenlegal.com

*Counsel for Plaintiff*